## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| NICHOLAS CHRYSOGELOS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 3669 |
| v. | ) | |
| | ) | Magistrate Judge |
| CAROLYN W. COLVIN,[1] | ) | Maria Valdez |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision

of the Commissioner of Social Security denying plaintiff Nicholas Chrysogelos's

("Claimant" or "Chrysogelos") claim for Supplemental Security Income and

Disability Insurance benefits. The parties have consented to the jurisdiction of the

United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons

that follow, Chrysogelos's motion for summary judgment [Doc. No. 19] is denied.

The Government's motion for summary judgment [Doc. No. 25] is granted.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as defendant in this suit.

<strong><u>BACKGROUND</u></strong>

## I.    PROCEDURAL HISTORY

Claimant originally applied for Title II Disability Insurance benefits and Title XVI Supplemental Security Income on June 19, 2006. (R. 314–22.) He alleged disability beginning July 11, 2005. (R. 314.) Claimant identified discogenic and degenerative back problems as his basis for disability. (R. 110.) His claims were denied initially on December 19, 2006, (R. 131,) and upon reconsideration on May 10, 2007. (R. 137.) Claimant filed a timely request for a hearing by an Administrative Law Judge ("ALJ"), which was held on September 17, 2008. (R. 82.)

On March 13, 2009, the ALJ found Claimant ineligible for benefits and found him not disabled under the Social Security Act. (R. 120.) Claimant requested review of the decision by the Social Security Administration Appeals Council, which remanded the case to the ALJ on December 3, 2010, with instructions obtain more evidence and further evaluate his claims. (R. 121–26.) On August 25, 2011, Claimant appeared at a second hearing before the ALJ. (R. 42.) At the hearing, James Breen testified as a vocational expert ("VE") and Dr. Mark Oberlander testified as a medical expert ("ME"). (*Id*.)

On November 21, 2011, the ALJ again denied Claimant benefits and found him not disabled. (R.19–31.) The Appeals Council denied Claimant's request for review, (R. 1–4,) leaving the ALJ's second decision as the final decision of the Commissioner of Social Security and therefore reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

2

## II.    FACTUAL BACKGROUND

### A.    Claimant's History

Claimant was born on June 19, 1967. (R. 247.) He is not married and has no children. (R. 43–44.) Claimant worked as a delivery driver from 1982 to 2005. (R. 401.) He claims disability due to back pain resulting from herniated discs, nerve damage, and muscle damage in his back. (R. 393.) The injuries that prevent Claimant from working stem from an on the job accident which occurred on July 11, 2005. (*Id*.)

In a physical impairments questionnaire, Claimant reported that he cannot lift any objects over five pounds and cannot reach over his head. (R. 488.) He can walk, but must rest every few minutes. (R. 489.) When he does drive, it is only for a few minutes due to pain. (*Id*.) Claimant cannot sit for more than two hours, and if he is sitting for up to an hour, he has to recline to reduce pain. (*Id*.) Claimant also noted that he has a hard time reading due to dyslexia and that he has difficulty concentrating. (R. 488.)

In his function report, Claimant wrote that he regularly does not leave his bed due to back pain and depression. (R. 479.) His friends and family generally come to his home to help with housework, including cleaning, laundry, cooking, and pet care. (R. 479–82.) Claimant has tried to do yard work, but it was too painful to sustain and he needed several days of bed rest to recover. (R. 482.) He cannot climb or descend stairs. (*Id*.) Claimant typically does not sleep more than three hours a night due to pain and spends most of his day watching television. (R. 480–83.)

Claimant does not drive, except in emergencies. (R. 482.) Typically, his mother will take him to the grocery store and will load and unload food from his car. (*Id*.) Claimant attends church once a month, but does not spend other time socializing. (R. 483.) He visits his therapist twice a month. (*Id*.)

## B. **Testimony and Medical Evidence**

### 1. **Claimant's Testimony**

During his second hearing before the ALJ, Claimant testified that he is not working and has not worked since his original hearing. (R. 44.) After his accident, he lost 35 or 40 pounds. (*Id*.) Claimant cannot walk more than a quarter-mile. (R. 46.) He can stand for 20 minutes before he has to sit down. (*Id*.) It is painful for Claimant to sit erect for more than 20 to 30 minutes. (*Id*.) He has difficulty carrying objects that weigh more than 15 pounds. (*Id*.) He struggles with climbing stairs, bending, stooping, crouching, and kneeling. (R. 46–47.) He cannot reach over his head and occasionally suffers from pain while using his hands. (*Id*.)

Claimant has trouble sleeping more than three and a half hours a night. (*Id*.) He regularly spends most of his day lying down. (R. 47, 58.) Claimant sometimes goes several days without showering because he is unmotivated to get out of bed. (R. 47–48.) He drives once or twice a week to get food or to shop for groceries. (R. 48–49.) His mother typically shops for him and he cannot cook anything beyond simple meals. (*Id*.) He is able to load and unload a dishwasher, make his bed, and care for his cat, but cannot clean or take out the garbage. (R. 48–50.)

Claimant occasionally travels with his family to visit Woodhaven Lake, roughly seventy miles from his home, where he sits by the water and sometimes fishes. (R. 51.) He also belongs to a pool league, but typically only watches his teammates and does not play. (R. 52.) Claimant uses a computer four times a month and uses his cell phone to keep track of appointments. (*Id*.) He has trouble remembering what he reads shortly after he has read it. (R. 58.)

Claimant testified that he sees as "pain doctor" and that he received x-ray and MRI results indicating that he has five herniated discs. (R. 53.) He sees a psychiatrist once a month and a therapist twice a month. (*Id*.) Claimant takes 22 different medications at four different times during the day. (R. 56.) He reports that depression medication has helped with his mental symptoms. (R. 55.) At one point, he attempted to stop taking Xanax, but went through withdrawal symptoms and returned to taking it a short time later. (R. 57.)

## 2. Medical evidence

On July 27, 2005, Claimant saw Dr. Pavel Huboda for an initial physiatric consultation following the accident which caused his injuries. (R. 634.) During the visit, he complained of back pain, numbness in his left arm during the night, and decreased grip strength in his left hand. (*Id*.) Huboda's impression was that Claimant suffered from an L5-S1 disc protrusion and/or herniation, lumbar radiculopathy, C6 radiculopathy (secondary to disc protrusion), cervical and lumbar myofascial pain syndrome, and mild anxiety. (R. 636.) An MRI taken at GlenOaks Hospital on August 1, 2005 showed a small left lateral disc protrusion at vertebrae

C5-C6 with problems at other disc levels. (R. 793.) The MRI notes stated no other abnormalities. (*Id*.) After a follow up appointment on August 30, 2005, Huboda stated that Claimant's condition had improved following a lumbar epidural steroid injection. (R. 637.) During that appointment, "no significant symptoms were reported" by Claimant. (*Id*.) Huboda restated the symptoms from his July 27 notes, adding that Claimant's anxiety was "mild/moderate." (R. 638.)

Claimant received bilateral epidural steroid injections on August 19, September 9, and September 30, 2005. (R. 673.) On October 6, 2005, he saw Dr. Jeffrey Oken for treatment of his continued chronic back pain. (R. 655–58.) Oken's impression was that Claimant had myofascial pain syndrome, anxiety disorder, and radiculopathy at vertebrae C5 and L4-5. (R. 657.) At a follow-up evaluation on November 3, 2005, Oken noted a small left lateral disc protrusion at vertebrae C5-C6 and a lumbar disc protrusion/herniation to the left at vertabrae L5-S1. (R. 659.) Oken designed a chronic pain program for Claimant, including desensitization techniques, core stability work, and other exercises. (R. 752.) Claimant generally complied with the program, but frequently complained of poor sleep and intense pain. (R.746, 748.) December 8, 2005 was the last day of Claimant's pain management with program with Oken. (R. 721.) During this visit, Oken recommended that he join a health club and continue his exercise program independently. (*Id*.) Claimant continued to experience pain in his back, but refused trigger points injections. (*Id*.) Oken anticipated Claimant "getting back to work in some fashion in roughly 30 days." (*Id*.)

During follow-up appointments with Oken in early 2006, Claimant complained of continued pain and numbness in his right leg. (R. 700, 716.) On March 20, 2006, Oken indicated Claimant was taking Mobic, Prevacid, Zanaflex, Norco, Trazodone and Xanax daily for various ailments, including pain and problems sleeping. (R. 698.) Oken's notes from that visit also discuss a March 15, 2006 MRI, which showed an L5-S1 disc protrusion not causing significant mass effect in the region. (R. 696.) The MRI showed no other abnormalities in Claimant's spine. (*Id*.)

On June 5, 2006, Claimant saw Dr. Christopher Parnell for continued neck and back pain. (R. 883.) Parnell reported that Claimant was in severe pain, in addition to experiencing numbness in his right leg and left hand. (*Id*.) Parnell also noted that Claimant had ceased recommended physical therapy and psychological treatment due to lack of money. (*Id*.) During a second visit to Parnell a month later, Claimant was found to have decreased range of motion in his upper and lower back. (R. 881.)

Treatment notes from several physicians show that impressions of Claimant's condition remained functionally the same — including back pain, problems sleeping, and heavy reliance on medications — through the end of the medical record in August, 2011. (R. 877, 916, 954, 1435–37.) On December 19, 2007, Dr. Oken opined that "the patient will have intractable pain." (R. 926.) Oken expressed worry on March 17, 2008 that it was "quite difficult to get the patient to engage in a treatment plan" and that Claimant was uninterested in taking advantage of his

referral to a psychologist. (R. 922–23.) On June 12, 2008, Oken observed ailments consistent with Claimant's prior visits, this time adding lumbar radiculopathy, cervical radiculopathy, chronic anxiety and depression, and chronic opiate use. (R. 912.) A year later on October 30, 2009, Oken reported that Claimant had failed a toxicology screen and decided to wean him off of opiate medications. (R. 1002.) Claimant was advised that he could still be seen by the pain clinic — although he would no longer be prescribed opioid medications — and that he should be evaluated by an addiction specialist. (R. 1003.) Claimant decided that, although he wanted to continue to be seen by Oken given a long history as Claimant's treating physician, he did not want to stay with the Marianjoy Clinic unless he could continue to be prescribed opiates. (R. 1005.) This was the last record of Claimant's visits with Oken.

On November 9, 2009, Dr. Zia Durrani saw Claimant for continued back pain symptoms. (R. 1170–72.) He noted the long list of Claimant's medications and Claimant's unwillingness to cut back on his dosage. (R. 1171.) Durrani's diagnosis included fibromyalgia, a history of spinal disc herniations, lumbar facet syndrome, and a history of anxiety and depression. (*Id*.) During a visit to Dr. Nicholas Kondelis on January 5, 2010, Claimant presented with the same symptoms, requesting an increase in his prescribed dosage of Norco, which Kondelis denied. (R. 1163.) He again presented on July 6, 2010, with continued pain symptoms, requesting additional narcotics for pain associated with physical therapy, this

time Dilaudid. (R. 1432.) Claimant thereafter presented monthly to Kondelis through June 28, 2011 for pain prescription refills with no substantial changes made to his diagnoses. (R. 1440–45.)

In advance of Claimant's disability applications and hearings, doctors prepared multiple assessments of his ability to engage in work-related activities. On December 18, 2005, Dr. Francis Vincent, a non-examining state agency physician, reviewed Claimant's medical files for the purpose of performing a residual functional capacity ("RFC") assessment. (R. 901.) Vincent concluded that Claimant had limited ability to crouch, bend, and crawl, and could never climb ladders or scaffolds. (R. 903.) Vincent also noted that Claimant seemed "not able to reconcile himself to pain issue and work towards healing." (R. 908.) Dr. Roopa Karri performed a consultative examination of Claimant for the Bureau of Disability Determination Services on November 21, 2006. (R. 896–99.) During the exam, Karri noted that Claimant had a limp in his right leg and that he could not walk on his toes or heels or squat. (R. 897.) Karri reported "no signs of depression, agitation, irritability or anxiety." (R. 899.)

In a letter to Claimant's attorney dated June 12, 2007, Dr. Oken answered several questions, presumably for the purpose of preparing for Claimant's hearing before the ALJ. (R. 953.) Oken described Claimant's medical history and symptoms, concluding that Claimant would "inevitably have chronic intractable pain requiring medical treatment" and would need "continued medication for the rest of his life." (R. 954.) Oken also stated that Claimant was not capable of gainful employment

due to his inability to concentrate and because he could not sit or stand long enough to be employable. (*Id.*) On October 22, 2009, Oken filled out an Illinois Department of Human Services Medical Evaluation, stating that Claimant suffered from pain in his neck, back, and down his legs. (R. 999.) He indicated that Claimant had more than 50% reduced capacity to walk, bend, stand, stoop, sit, climb, push, pull, and speak. (R. 1001.) Oken also marked that Claimant had 20-50% reduced capacity in manual dexterity and could not lift more than ten pounds at a time. (*Id.*)

Claimant began seeking mental health treatment at Dupage County Health Department in 2009. (R. 1110.) During a visit on November 2, 2009, Claimant described having broken up with his girlfriend, but stated that his life was "healthier" and that he had started to go out more in her absence. (R. 1110.) The notes also state that Claimant was "going through an adjustment, but [seems] OK." (*Id.*) In January, 2010, Dr. Reham Sedak noted that Claimant had stopped taking Lexapro for depression, and had not started taking Mirtazepine, although he was instructed to do so. (R. 1120.) During that visit, Sadek assigned Claimant a Global Assessment of Functioning ("GAF")[2] score of 50, suggesting "serious symptoms or impairment." (R. 1124.) On March 15, 2010, Claimant was again diagnosed with recurrent and severe major depressive disorder without psychotic features, opioid dependence, and cocaine abuse. (R. 1142.) His GAF score remained at 50. (*Id.*)

---

[2] GAF scores are indicators of mental capacity which provide "measures of both severity of symptoms and functional level." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citations omitted).

Claimant attended counseling sessions with Dawn Arimura at varying intervals between March 25, 2009 and March 23, 2010. (R. 1144.) On April 20, 2010, Arimura indicated that she had seen Claimant for 18 counseling sessions. (*Id*.) She reported that, based on her administration of Beck's Depression Inventory, Claimant appeared to have severe depression, with symptoms of sleep disturbance, anhedonia, agitation, inability to concentrate, and cognitive impairments. (R. 1144–46.) In a letter to Claimant's attorney, she stated that she did not believe that Claimant would be able to work a full time job because of his pain issues, cognitive impairment, and depression. (R. 1146.)

On July 2, 2010, Claimant saw Dr. Stephen Penepacker, who reported Claimants' descriptions of his depression, which were consistent with those he reported to other psychiatrists. (R. 1340.) Penepacker also noted Claimant's cognitive difficulties, concluding that despite Claimant's attribution of his difficulties to ADHD, it was "not clear this is the best explanation for cognitive deficits." (R. 1341.) On August 10, 2010, Penepacker wrote a letter in support of Claimant's application for Social Security benefits. (R. 1326.) In the letter, Penepacker wrote that he had removed prior diagnoses of opioid dependence and cocaine abuse, because he thought "[Claimant] has misused controlled substances in the recent past, and he has reported using illegal drugs in the remote past, but . . . both of these relate more to his general impulsivity and poor judgment than a specific focus on any substance abuse." (*Id*.) On May 17, 2011, Penepacker saw Claimant for the last time reported in the record. (R. 1417.) He diagnosed Claimant

with major depressive disorder, generalized anxiety disorder, and ADHD. (R. 1417.) Claimant's GAF score was measured at 46. (*Id.*) Penepacker described Claimant's progress toward treatment goals as "stable but impaired." (*Id.*)

### 3. Medical expert's testimony

At Claimant's hearing, the ME testified that evidence in the record showed that Claimant suffered from mental impairments under multiple social security listings. (R. 61.) Claimant's demonstrated impairments included: adult ADHD; an affective disorder; major depressive disorder in partial remission; generalized anxiety disorder; and borderline personality disorder with dependent features. (R. 62–63.) The ME also noted Claimant's abuse of medications and illegal substances. (R. 63.)

The ME concluded that Claimant had the RFC to engage in simple and repetitive routine work activities with infrequent contact with coworkers, the public, and supervisors. (R. 65.) Claimant was found to be relatively socially functional given, among other things, his ability to maintain a romantic relationship for 14 years. (R. 65–66.) Based on the totality of the record, the ME also concluded that Claimant had moderate functional limitations in concentration, persistence, memory, and pace. (R. 66, 71–73.)

### 4. Vocational expert's testimony

The VE was asked whether a person of Claimant's age, education, and work experience could find work in the national economy if he or she were: (1) able to lift and carry less than ten pounds frequently and more than 10 pounds occasionally;

(2) able to stand walk a total of two hours during an eight-hour work day and sit for

six hours a day, but needing the option to stand for two minutes for every hour of

sitting; (3) unable to interact with the public for work related purposes but capable

of occasional contact with coworkers and supervisors; and (4) capable of work

limited to two to three-step simple, repetitive and routine tasks. (R. 74–75.) He

concluded such a person could not perform Claimant's past work, but could perform

other unskilled and sedentary jobs. (R. 75.) Examples given by the VE of jobs

available to a worker with the listed limitations included sorting (8,000 jobs),

eyeglass assembly (2,000 jobs), and circuit board assembly (6,000 jobs). (R. 75.) If

the hypothetical person was off task for 20% of the typical workday, had to lie down

for 75% of the workday, or missed two days of work a month, the VE stated that he

or she would be unemployable. (R. 75–76.)

> **C.**   **ALJ Decision**

On remand, the ALJ recited the Appeals Council's directive that she gather

additional evidence of Claimant's impairments and further evaluate his complaints.

(R. 19–20.) The ALJ found that Claimant had not engaged in substantial gainful

activity from his initial onset date of July 11, 2005. (R. 22.) She also stated that

Claimant had severe impairments of a lumbosacral disc herniation, depression and

anxiety, and a substance abuse disorder. (*Id*.) The ALJ concluded that none of

Claimant's impairments, alone or in combination, met or equaled a medically

determinable impairment listed in 20 C.F.R. Part 404. (R. 23.)

The ALJ next determined that Claimant had the RFC to perform sedentary work, provided that it would allow him to stand for one to two minutes after sitting for an hour. (R. 25.) The ALJ found that, while working, Claimant should be kept from contact with the public for work-related purposes, but that he could interact occasionally with co-workers and supervisors. (*Id*.) At a suitable sedentary job, Claimant would only have to perform simple two or three step repetitive tasks. (*Id*.)

The ALJ found that Claimant's testimony regarding the intensity, persistence, and limiting effects of the symptoms associated with his injuries was not credible. (R. 26.) The ALJ first pointed out the absence of medical treatment in Claimant's record, despite having received a workers compensation settlement, which the ALJ stated would have allowed him to pay for treatment. (*Id*.) The ALJ also cited medical records indicating Claimant's ability to walk a half-mile and relatively good dexterity and which discouraged bed rest. (R 26–27.) The ALJ further noted that "at one point or another in the record . . . the claimant has reported performing a variety of daily activities." (R 27.)

The ALJ discussed Claimant's mental limitations, concluding that inconsistent testimony as to the cause for his problems with concentration, delays in his pursuit of mental health treatment, and treatment records indicating an improved mental condition called Claimant's credibility into question. (R 27–28.) She also found that Claimant's use of marijuana and contradictory statements made to treating physicians concerning his willingness to provide a urine sample during the course of his treatment "cast a shadow over his veracity." (R. 28.)

In discussing the opinion evidence presented, the ALJ gave limited weight to Dr. Oken's opinion due to his failure to describe Claimant's specific limitations and his inconsistent statements about Claimant's ability to concentrate. (*Id.*) The ALJ gave the opinion of Dawn Arimura no weight because she was not a psychologist. (R. 29.) The ALJ gave no weight to Dr. Penepacker's opinions regarding Claimant's mental limitations because "he could not obtain information on the claimant and the conclusions are based on what the claimant allows him to know." (*Id.*)

After assessing Claimant's work history, the ALJ concluded that he was unable to perform any of his past relevant work. (R. 30.) However, she added that, based on Claimant's age, education, work experience, and RFC, he could perform work in available jobs such as sorter, eyeglass assembler, or circuit board assembler. (R. 30–31.) Based on this conclusion, the ALJ found that Chrysogelos had not been under a disability from the time of his initial claim through the decision and therefore denied his claim for benefits. (*Id.*)

## DISCUSSION

### I. ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is

disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir.1992). A negative answer at any step, other than at step 3, precludes a finding of disability. Id. The claimant bears the burden of proof at steps 1–4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863 , 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its own judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits, "he must build an accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872, and "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III.  ANALYSIS

Claimant makes four arguments in support of his appeal from the ALJ's decision: (1) the ALJ did not adequately support her decision to discount Dr. Oken's opinions from a report prepared for the Illinois Department of Human Services in support of Claimant's application for benefits; (2) the ALJ's RFC assessment did not include all of Claimant's work-related limitations; (3) the ALJ did not provide medical support for her RFC assessment; and (4) the ALJ's improperly found Claimant was not credible.

### A.  <u>Dr. Oken's Opinion</u>

Claimant argues that the ALJ should not have rejected Dr. Oken's opinions from a medical evaluation he prepared for the Illinois Department of Human Services because those opinions were supported by objective evidence. Specifically, Claimant argues that the ALJ incorrectly found that there was insufficient support for Oken's opinions regarding limitations on Claimant's ability to walk and use his hands. The Commissioner responds that the ALJ correctly followed relevant regulations and properly considered records of conservative treatment, lack of supporting medical evidence, and evidence elsewhere in the record in that contradicted Oken's opinions.

"Normally, '[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record.'"*Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 503

(7th Cir. 2004)). Nonetheless, treating physicians' opinions are not necessarily dispositive of disability, specifically because "[t]he patient's regular physician may want to do a favor for a friend or client, and so the treating physician may too quickly find disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (quotations omitted). As a result, an ALJ may discount a treating physician's medical opinion, so long as he "minimally articulates his reasons for crediting or rejecting evidence of disability." *Schmidt*, 496 F.3d at 842.

The ALJ discounted Oken's opinions regarding limitations on Claimant's ability to use his hands and to walk because she found that treatment records did not contain "any objective evidence of bilateral finger limitations and progress notes indicate that claimant ambulates well." (R. 29.) Claimant points to his own statements to Oken during treatment about difficulty walking, problems with sensation, and limited range of motion in his gait as evidence that Claimant's walking capacity was reduced by 50%. Claimant states that Oken had previously recorded diminished strength — described as 4/5 — in Claimant's upper and lower extremities. Claimant also cites to four pages in the record which purportedly show diminished strength and abnormal testing in support of Claimant's limitations in using his hands, but those pages reveal little more than Oken's indication that Claimant's upper and lower body strength was between 4+ and 5 out of 5 bilaterally. (R. 925.)

The ALJ's decision to discount Oken's report is supported by evidence in the record which suggests that Claimant was walking well and had few to no limitations on his dexterity. In her description of Claimant's medical history, the ALJ noted a 2005 examination by Dr. Huboda which revealed a normal range of motion in Claimant's upper body, a normal gait, and normal strength in all muscle groups. The ALJ also recited Dr. Karri's 2006 findings that Claimant could make a fist, turn a doorknob, use buttons, and write, and Oken's June 2008 notes indicating that Claimant could walk a half-mile.

In light of contradictory evidence and the lack of medical evidence supporting Oken's conclusions in the Illinois Department of Human Services form, the ALJ's choice to limit weight given to Oken's opinion was not erroneous. Claimant has not identified any evidence in the record which substantiates Oken's opinion regarding a reduction in manual dexterity and shows that the ALJ did not have good reasons for discounting that opinion. Furthermore, the record contradicts Dr. Oken's opinion that Claimant's ability to walk was reduced by 50%.[3] "[A]n ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). Here, the ALJ sufficiently articulated her reasons for rejecting Oken's opinions.

---

[3] Claimant's reply brief does not mention the ALJ's alleged error in discounting Oken's opinions concerning his ability to walk.

### B. Work-Related Limitations and Claimant's RFC

Claimant next asserts that the ALJ's assessment of his RFC was improper because it did not account for Oken's report that Claimant had a 20-50% reduction in manual dexterity. Claimant further argues that the ALJ cited no medical evidence to support her determination that Claimant had the RFC to perform a limited range of sedentary work and that she should have found Claimant's cervical disc disease and cervical radiculopathy to be severe impairments. The Commissioner responds that the ALJ properly considered all relevant medical evidence in the record in determining Claimant's RFC.

An adequate discussion of a Claimant's symptoms and RFC by an ALJ need not provide "a complete written evaluation of every piece of evidence." *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). Here, the ALJ's decision shows considerable review of the record — likely as a result of this decision coming on remand from the Appeals Council — listing several doctors visits and assessments of Claimant's physical and mental capabilities. The ALJ then used the portions of the record she found credible and persuasive to conclude that Claimant could perform sedentary work, which limits the amount a worker can be required to lift to ten pounds and only requires occasional standing and walking. 20 C.F.R. § 404.1567(a). Claimant believes that the ALJ's failure to account for alleged limitations to his manual dexterity and the ALJ's omission of his cervical disc abnormalities from the list of Claimant's "severe" impairments caused her to fail to ask the VE important questions regarding applicable work limitations.

The Court has found that the ALJ's decision to discount Oken's opinion regarding Claimant's dexterity was not erroneous. Furthermore, the ALJ appears to have thoroughly reviewed Claimant's record, noting MRIs and an EMG/NVC study which did no show evidence of disc herniations or radiculopathy. (R. 22, 27.) Finally, Claimant has not shown in what ways, if any, he was prejudiced by the ALJ's omission of his cervical ailments and manipulative limitations. Thus, Claimant has not shown that the process the ALJ used in reaching her ALJ assessment was erroneous, nor has he shown that any alleged errors warrant remand.

### C. Medical Support for ALJ's RFC Determination

Claimant's argument that the ALJ provided no medical support for her RFC determination is similarly unpersuasive. The portions of the ALJ's decision preceding her RFC determination recite several pages of relevant medical evidence, in addition to Claimant's testimony regarding his daily activities. Contrary to Claimant's assertion that the ALJ failed to consider the opinion of the state agency consultant, Dr. Vincent, the ALJ explicitly stated that she considered his report in reaching her conclusions concerning Claimant's RFC. (R. 24.) It is worth noting that, while Dr. Vincent limited Claimant to "light" work, the ALJ found that Claimant required further restrictions and concluded that he should be confined to sedentary work based on the medical evidence. The ALJ's decision clearly constructs a "logical bridge" between the available evidence and her conclusions. *See, e.g. Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (stating the required connection between evidence

considered by an ALJ and her disability findings). Given that the ALJ substantiated her decision using medical evidence and considered the opinion of the state agency consultant, her RFC assessment does not require remand to the ALJ.

**D.     Claimant's Credibility**

Claimant lastly argues that the ALJ erroneously discredited his testimony because she wrongly believed that Claimant received only "sparse" treatment for his ailments. (R. 26.) Claimant points to visits with Oken every three months and monthly visits to Kondelis beginning in 2009 — as well as regular treatment by mental health professionals — in support of his argument. The Commissioner defends the ALJ's determination that Claimant was not credible as reasonable in light of evidence contrary to Claimant's testimony, lack of evidence of treatment for Claimant's alleged symptoms, and contradictory statements made by Claimant during his testimony.

An ALJ's credibility determination is entitled to substantial deference on review unless it is patently wrong and unsupported by the record. *Schmidt*, 496 F.3d at 843; *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). "However, an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir. 2013). "A failure to do so could . . . be grounds for reversal." *Id*. Reviewing courts should avoid disturbing an ALJ's credibility determination so long as it is reasonable and supported by the record. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

Claimant argues that the ALJ's credibility determination was improper because, although the ALJ concluded that Claimant received sparse treatment, the record shows that he saw Oken and Kondelis frequently. Claimant then briefly cites SSR 96-7p for the proposition that frequency of treatment is an important factor in determining a claimant's credibility. The Commissioner responds that the ALJ's credibility determination should be afforded deference because it was reasonable and supported by the record.

The ALJ's credibility finding was largely based on inconsistencies between Claimant's testimony and behavior and medical evidence. She found that Claimant's activities, including watching lengthy television shows, using a computer and a cell phone, regularly leaving the house to play pool, and visiting his parents' lake house belied his physical and mental limitations. She also found that Claimant's failure to be fully candid about his drug use and noncompliance with doctors' requests for urine samples called the reliability of his testimony into question. Claimant does not contest these reasons for finding his testimony to be less than credible.

While the ALJ's discussion of Claimant's "sparse treatment" appears to be inconsistent with records showing that he made regular visits to doctors, this error does not overwhelm the ALJ's other justifications for her credibility determination. The ALJ reasonably found that inconsistencies in the record and in Claimant's testimony, as well as records of Claimant's suspicious behavior in dealing with his doctors limited his credibility. As a result, the Court defers to the ALJ's determination and will not disturb it.

## CONCLUSION

For the foregoing reasons, Plaintiff Nicholas Chrysogelos's motion for summary judgment [Doc. No. 19] is denied. The Government's motion for summary judgment [Doc. No. 25] is granted.

**SO ORDERED.**                                        **ENTERED:**

**DATE:**    **April 4, 2014**          _____

                                        **HON. MARIA VALDEZ**

                                        **United States Magistrate Judge**